[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 19, 2010
JOHN LEY
ACTING CLERK

No. 09-10878
Non-Argument Calendar

_____

D. C. Docket No. 07-00140-CR-03-JEC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RENITA BOND,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 19, 2010)

Before TJOFLAT, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Renita Bond appeals her convictions and sentence of 27 months of

imprisonment for conspiring to commit mail and wire fraud, conspiring to launder money, and wire fraud. 18 U.S.C. §§ 2, 371, 1341, 1343, 1956. Bond challenges the admission of videotaped deposition testimony and a statement by a codefendant, the sufficiency of the evidence to support her conviction for conspiring to launder money, and the denial of her motion for a minor role reduction. We affirm.

## I. BACKGROUND

Joseph Akins ran a telemarketing scheme in which he targeted and defrauded elderly women. Akins called the victims, announced they had won a prize from a sweepstakes company, and instructed them to mail or wire an advance fee to claim their prize. With some victims, Akins continued to extract payments by threatening either to withhold the prizes, sue the victims for breach of contract, or prosecute them for a criminal offense. To avoid detection by federal authorities, Akins instructed the victims to wire multiple payments in amounts less than $3000 made payable to Akins's cohorts, who retrieved the cash and retained a percentage of the money. During his scam, Akins exacted from his victims between a quarter of a million and a million dollars.

Bond met Akins and became one of his couriers. Victims of Akins's scam made 12 wire transfers payable to Bond that she shared with Akins. Bond also

2

lived in residences rented by Akins that he used as a base of operations to telephone his victims.

Bond, Akins, and several other cohorts were charged in an indictment for their involvement in the conspiracy, and nine cohorts pleaded guilty. In a second superceding indictment, Bond was indicted for conspiracy to commit mail and wire fraud, 18 U.S.C. §§ 371, 1341, 1343, conspiracy to launder money, id. §§ 2, 371, 1956, and 12 counts of wire fraud, id. § 1343. Bond pleaded not guilty to the charges.

Before trial, the government moved to depose three victims who lived in Illinois, California, and Ohio. Fed. R. Crim. P. 15(a). The government explained that, due to age and physical limitations, the victims would be unable to travel to Georgia to testify at trial. Bond responded that she would be "generally . . . prejudiced if the Government [was] allowed to present testimony through depositions . . . at trial rather than through live witnesses," but Bond "concede[d]" that the government had "made a sufficient showing" to depose the victims.

The government later moved to extend the deadline to depose witnesses. The government identified four potential witnesses, but stated that it intended to depose only Grace Yoshioka, a resident of Hawaii, who had sent payments to all but one defendant named in the indictment. The government stated that Yoshioka,

was the "lead victim" of the telemarketing scheme, was "elderly and infirm," and was incapable of "travel[ing] to Atlanta for trial without grave physical hardship."

Bond did not object to the motion to depose Yoshioka. The district court granted the motion and found that "due to the witnesses' unavailability to travel because of physical limitations, and the materiality of their testimony, as articulated in the government's motions, exceptional circumstances exist to take such depositions." Bond waived her right to attend Yoshioka's deposition with the understanding "that the testimony given at the deposition will likely be admitted into evidence at trial."

Before trial, Bond objected to the admission of Yoshioka's videotaped deposition testimony. Bond argued that admitting the deposition would violate her right to confront Yoshioka with evidence discovered after her deposition and as it might develop during the trial. The district court did not rule on Bond's motion and instead instructed Bond "at a break [to] put on the record what" she "would have asked [Yoshioka] differently . . . ."

At trial, the government played Yoshioka's videotaped deposition testimony. Bond did not object or make a proffer about what questions she would have asked Yoshioka during the trial. When the government later admitted the videotape into evidence, the district court asked if Bond had an objection, and counsel for Bond

4

responded, "We have previously objected but we don't offer anything new."

The government introduced evidence about Bond's role in the conspiracy. Alan Freedman, a sales manager with Moneygram International, identified documents that established Bond had collected money wired by Akins's victims in 2003, 2004, and 2007. Alexander Latour, an inspector of the United States Postal Inspection Service, testified that Akins admitted that he had rented a house for Bond and Akins took Latour to the residence.

Akins testified that he headed the conspiracy and that he used fictitious names and blocked his telephone number when he called his victims. Akins said that he advised his couriers about how to collect the money transfers and relied on information they provided to adjust periodically the collection processes to reduce the paper trail and conceal their fraud. Akins explained that he instructed his victims to send their payments in increments less than $3000 so the couriers had to produce the least amount of identification to collect the money.

Akins also discussed Bond's role in the conspiracy. Akins testified that Bond had collected money for him and he "helped her get" an apartment in Morrow, Georgia, a house on Virginia Avenue in Atlanta, and "another apartment." Akins confirmed that he had "pitch[ed]" from Bond's residences and in her presence. According to Akins, "[t]hat was the purpose of setting [Bond] up .

5

. . ." Akins later acknowledged that Bond took a two-year hiatus from the conspiracy.

When the government questioned Akins about the number of collections Bond made during the conspiracy, Akins first responded that Bond had made "a lot." The government next asked Akins to give a "ballpark figure" of the number of collections, and Akins responded "it was more than the indictment was to show." After the government asked Akins four more questions, Bond asked for a bench conference and argued that the government had elicited evidence of prior bad acts without giving Bond notice as required by Federal Rule of Evidence 404(b). Bond requested as a remedy that the court "instruct [the prosecutor] to not pursue this line of questioning" and instruct "the jury that there is no evidence, no documentary evidence, and . . . no charge that Ms. Bond was provided." The district court cautioned the prosecutor "not to elicit anything that suggests as to specific transactions, anything beyond what is set out in the indictment" and stated that the parties would "decide later what kind of instruction to give." Bond then "mov[ed] for a mistrial based on [her] objection," which the district court denied.

The parties agreed on a joint proposed stipulation for the district court to read to the jury "at the end of the testimony or at some other time." At the close of the case by the government, the district court twice instructed the jury that "[t]he

6

government has no evidence other than Mr. Akins' testimony that Ms. Bond was involved in any pickups of wire transfers from Western Union or Moneygram other than those that have been listed in the indictment."

Bond moved for a judgment of acquittal. Bond argued that the government had failed to prove that Bond participated in "any kind of concealment, to support a concealment object" to support a conviction for conspiring to launder money. Bond acknowledged that, even if the district court granted the motion, "it wouldn't dismiss the entire charge" because the government had also charged Bond for participating with the intent to promote the conspiracy. The district court denied Bond's motion and ruled that "the fact that Akins chose people such as Ms. Bond to go and retrieve the money in their name was an effort to conceal, to make it tougher to get to the bottom of it."

The jury found Bond guilty of conspiracy to commit mail and wire fraud, 18 U.S.C. §§ 371, 1341, 1343, conspiracy to launder money, id. §§ 2, 371, 1956, and 12 counts of wire fraud, id. § 1343. Because Bond's offenses were closely related, the presentence investigation report grouped the convictions and provided a base offense level of 13. United States Sentencing Guideline §§ 2S1.1(a)(1), 3D1.2 (Nov. 2008). The report increased the base level by two points because Bond had laundered money. Id. § 2S1.1(b)(2)(B). With a criminal history of IV, the report

provided a sentencing range between 30 and 37 months of imprisonment.

Bond objected to the report. Bond argued that she was entitled to a reduction for her minor role in the conspiracy on two grounds: (1) she was responsible for the same amount of loss as codefendants who had received a reduction, and (2) although she was a member of the conspiracy for five years, which was longer than some of her codefendants, she did not participate in the conspiracy for two years. Bond also argued that her criminal history category overrepresented her criminal conduct.

The district court overruled Bond's objections in part. The district court ruled that Bond was ineligible for a minor role reduction because she had ceased, then resumed her misconduct, and because of the length of her involvement in the conspiracy. The court agreed with Bond that her criminal history of IV overrepresented her conduct and departed downward to a history of III, which resulted in an sentencing range between 24 and 30 months of imprisonment. Because Bond, "unlike every other defendant in [the] case," refused to "accept[] responsibility" and she was convicted of 14 crimes, the court found that a "middle of the range sentence [was] appropriate" and imposed a sentence of 27 months of imprisonment.

## II. STANDARDS OF REVIEW

We apply four standards of review in this appeal. Because Bond never challenged the finding that Yoshioka was unavailable for trial, we review her argument about a violation of the Confrontation Clause for plain error. United States v. Emmanuel, 565 F.3d 1324, 1333 (11th Cir. 2009). We review the denial of Bond's request for a mistrial for abuse of discretion. United States v. Newsome, 998 F.2d 1571, 1575 (11th Cir. 1993). We review de novo the denial of Bond's judgment of acquittal, and construe the evidence in the light most favorable to the government. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). The determination of Bond's role in the offense is a finding of fact we review for clear error. United States v. Rodriguez De Varon, 175 F.3d 930, 937 (11th Cir. 1999).

## III. DISCUSSION

Bond challenges her conviction and sentence on four grounds. All fail. We discuss each in turn.

*A. The District Court Did Not Plainly Err By Admitting the Videotaped Deposition Testimony of Victim Yoshioka.*

Bond argues that the admission of Yoshioka's videotaped deposition testimony violated her right of confrontation under the Sixth Amendment. Bond argues for the first time on appeal that the government failed to prove that

9

Yoshioka was unavailable for trial. Bond's argument fails.

A party in a criminal trial may move to depose a prospective witness to preserve her testimony for trial. Fed. R. Crim. P. 15(a)(1). The moving party must request the deposition based on "exceptional circumstances" to serve "the interest of justice." Id. Once taken, the deposition testimony may be admitted in whole or in part as evidence "as provided by the Federal Rules of Evidence." Id. 15(f).

The district court found that Yoshioka was unavailable for trial, and Bond never challenged that finding. A witness is unavailable for trial when she is "unable to be present or to testify at the hearing because of . . . then existing physical or mental illness or infirmity." Fed. R. Evid. 804(4). The infirmity of an elderly witness that makes travel a "grave physical hardship" is an exceptional circumstance that justifies the use of deposition testimony at trial, United States v. Keithan, 751 F.2d 9, 12 (1st Cir. 1984), and Bond cites no evidence that Yoshioka's condition changed in the interim between the deposition and trial. Counsel for Bond attended the deposition and cross-examined Yoshioka. Although Bond complains that admission of the deposition "compromise[d] [her] confrontation of" Yoshioka, Bond fails to explain what, if any, evidence she was unable to explore or respond to because Yoshioka was not present at trial. See United States v. Drogoul, 1 F.3d 1546, 1554 (11th Cir. 1993) (citing Keithan). The

10

district court did not plainly err by admitting the deposition testimony.

*B. The District Court Did Not Abuse Its Discretion by Denying Bond's Motion for a Mistrial.*

Bond argues that she was entitled to a mistrial after the government elicited from Akins that Bond had collected more than wire transfers than charged in her indictment, but we disagree. Error cannot be based on the admission of evidence unless "a substantial right of the party is affected" and the party timely objects to the alleged error. Fed. R. Evid. 103(a)(1). Bond waited until after the prosecution changed its line of questioning before she objected to the alleged bad acts evidence. Moreover, the admission of Akins's testimony did not substantially prejudice Bond because the government proved that Bond collected wire transfers from victims of Akins's sweepstakes scam. The district court also eradicated any potential prejudice by instructing the jury that they were to consider only those wire transfers that had been charged in Bond's indictment. See United States v. Diaz, 248 F.3d 1065, 1101 (11th Cir. 2001).

*C. The Government Introduced Sufficient Evidence to Support Bond's Conviction for Conspiracy to Launder Money.*

Bond challenges her conviction for conspiracy to launder money on two grounds. First, Bond argues that the government failed to prove her actions were intended to conceal the money laundering because she left a paper trail that

11

documented her crimes. Second, Bond argues for the first time on appeal that she did not promote the money laundering. Bond's arguments fail.

A reasonable jury could find that Bond concealed and promoted money laundering. Akins testified that he telephoned his victims from Bond's residences and in her presence; Akins used false names and blocked his telephone number during the calls; and Bond retrieved several wire transfers as a courier in the conspiracy. The jury could infer Bond knew that the proceeds were derived from an illegal activity; Akins concealed his identity from the victims using false names and couriers to collect the money; and Akins used proceeds from the sweepstakes scam to rent residences for Bond from which he called his victims.

*D. The District Court Did Not Err By Denying Bond a Minor Role Reduction.*

Bond argues that she was entitled to a reduction for her minor role because her involvement in the conspiracy caused the same amount of loss as her codefendants, but this argument also fails. To receive a minor role reduction, Bond had to establish that she was "less culpable than," not equally culpable to, "most other participants . . . ." U.S.S.G. § 3B1.2, cmt. n.5. Bond watched Akins scam elderly persons, and then Bond collected and lived off the thousands of dollars stolen from those victims. Bond was involved in the conspiracy for an extended period of time and, although she left the conspiracy for a couple of years, she later

resumed her role in the scam. The district court did not clearly err by denying Bond a minor role reduction.

## IV. CONCLUSION

Bond's conviction and sentence are **AFFIRMED**.